Amber L. Schubert (SBN 278696)
Sonum Dixit (SBN 353395)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: 415-788-4220
Fax: 415-788-0161
aschubert@sjk.law
sdixit@sjk.law

Jean Martin (*pro hac vice* forthcoming)
Christopher Pollack (*pro hac vice* forthcoming)
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLC**
17 East Main Street, Suite 200
Pensacola, FL 32502
T: (850) 202-1010
E: JMartin@awkolaw.com; cpollack@awkolaw.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

Jacob Dalessandro, individually and on behalf of all others similarly situated,

Plaintiff,

v.

iRhythm Holdings, Inc.,

Defendant.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jacob Dalessandro, individually and on behalf of all others similarly situated, brings this Class Action Complaint against iRhythm Holdings, Inc. ("Defendant" or "iRhythm") and alleges, upon personal knowledge as to his own actions and his counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. iRhythm is a healthcare company that specializes in the design, development, and commercialization of device-based technology used to monitor the hearts of millions of people across the United States.

2. Each iRhythm product offering combines a 14-day wearable biosensor with the company's cloud-based data analytic software to help physicians monitor patients and diagnose arrhythmias.[1] On average, the iRhythm monitoring device captures approximately 1.5 million heartbeats over a two-week period.

3. Since receiving FDA clearance, iRhythm has served over 12 million patients, and collected nearly 3 billion hours of heartbeat data.[2]

4. On or about June 15, 2026, iRhythm disclosed to the SEC that the company had experienced a cybersecurity incident (the "Data Breach" or "Breach"), in which someone exfiltrated sensitive information, including its patients' Protected Health Information ("PHI"),[3] as well as other personal information. (collectively, "Private Information").

5. Through this litigation, Plaintiff aims to determine the scope of the Data Breach, to obtain relief for the harms that he and others affected by the Breach have suffered, and to ensure that iRhythm adopts and implements the procedures necessary to prevent another breach like this from occurring in the future.

6. As detailed further below, the Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary

---

[1] iRhythm Holdings, Inc, 10-K (2025), *available at* https://www.sec.gov/Archives/edgar/data/1388658/000138865826000011/irtc-20251231.htm (last visited June 23, 2026).

[2] *Id.*

[3] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"), protected health information ("PHI") is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, *available at*: https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited June 23, 2026).

to protect patients' Private Information. In particular, iRhythm maintained the Private Information in a manner that made it vulnerable to cyberattacks.

7. Upon information and belief, the mechanism of the cyberattack and the potential for improper disclosure of Plaintiff and Class Members' Private Information was a known risk to iRhythm, and iRhythm failed to take reasonable steps necessary to secure the Private Information from those risks, thereby leaving the Private Information in a vulnerable position.

8. In doing so, iRhythm disregarded the rights of Plaintiff and Class Members by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions; failing to disclose that they did not have reasonable or adequately robust computer systems and security practices to safeguard patients' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiff and Class Members with prompt and meaningful notice regarding the Data Breach.

9. As a direct and proximate result of Defendant's failure to implement and follow reasonable security procedures, Plaintiff's and Class Members' Private Information is now in the possession of cybercriminals, and Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of criminal mischief. And these risks may continue for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

10. Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent theft of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of their Private Information; (f) invasion of their privacy; and (g) the continued risk to their sensitive Private Information, which remains in the possession of

Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collected and maintained.

11. Plaintiff seeks monetary damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard the Private Information in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiff and Class Members for their lifetimes.

12. More specifically, Plaintiff seeks remedies including, but not limited to, compensatory damages, statutory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

## II. PARTIES

13. Plaintiff Jacob Dalessandro is an adult, who at all relevant times, has been a resident and citizen of Ohio.

14. Defendant iRhythm Holdings, Inc., is a Delaware Corporation with its principal place of business located at 699 8th St., Suite 600, San Francisco, CA 94103.

## III. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

16. This Court has personal jurisdiction over Defendant because iRhythm is headquartered in California, its principal place of business is in California, and it regularly conducts business in California.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in, was directed to, and/or emanated from this District, iRhythm is based in this District, iRhythm maintains patients' Private Information in the District, and iRhythm has caused harm to Plaintiff and Class Members residing in this District.

18. Divisional Assignment: This action arises in San Francisco County, in that a substantial part of the events which give rise to the claims asserted herein occurred in San Francisco County, where Defendant is headquartered and located. Pursuant to L.R. 3-2(d), all civil actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

## IV. FACTUAL BACKGROUND

### A. iRhythm's Business

19. iRhythm is a digital healthcare company that provides cardiac monitoring technologies and services, including Zio ECG monitors and related data management and analysis services used by healthcare providers and patients.

20. Upon information and belief, Defendant made promises and representations to the patients and providers who use Defendant's products, including Plaintiff and Class Members, that the Private Information collected from patients would be kept safe and confidential, and that the privacy of their information would be maintained.[4]

21. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

22. As a result of collecting and storing the Private Information of Plaintiff and Class Members for its own financial benefit, Defendant had a continuous duty to adopt and implement reasonable measures to protect Plaintiff's and Class Members' Private Information from disclosure to third parties.

### B. The Data Breach

23. On June 8, 2026, iRhythm informed the Securities and Exchange Commission (SEC) that the company identified unauthorized activity involving data maintained on certain

[4] *Privacy Policy*, IRHYTHM TECHNOLOGIES, INC., https://www.irhythmtech.com/us/en/who-we-are/trust-center/privacy (last visited June 23, 2026).

third-party-hosted business applications, and that on June 9, 2026, the company received communications from a threat actor claiming to have obtained sensitive information.[5]

24. While iRhythm disclosed that the company's investigation confirmed that a Breach had occurred and that patients' "protected health information and other personal information" was exfiltrated during the Breach, iRhythm failed to provide any further information concerning what kinds of PHI and other information were involved.

25. At the same time, iRhythm attempted to minimize the incident, by stating that iRhythm does not store or retain individual financial account information or payment card information. And iRhythm did so even though it knew or should have known that data breaches involving Private Information, and PHI in particular, subject those affected by the breach to an immediate and ongoing risk of various harms, including financial harms above and beyond those facilitated by the exposure of financial account information or payment card information.

26. Moreover, while the company disclosed that the incident was "material in light of the volume of potentially affected data," iRhythm failed to provide any additional detail about the volume of data exfiltrated.[6]

27. iRhythm's description of how the Breach occurred was vague, stating only that the data was obtained through social engineering and the information was exfiltrated from certain third-party hosted business applications.

28. iRhythm also posted the following "Statement on Cybersecurity Incident" on its webpage:

> iRhythm Holdings maintains a comprehensive cybersecurity and information security program designed to protect company systems, data, and operations. Our teams continuously monitor the threat landscape and implement safeguards aligned with industry practices.
>
> Consistent with these security protocols, we recently identified a cybersecurity incident and promptly activated our incident response

[5] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001388658/000138865826000055/irtc-20260610.htm

[6] *Id.*

> plans, launching an investigation with support from external advisors and cybersecurity experts.
>
> We have not identified any impact to our products, our clinical or medical device systems, our connections to customers, our manufacturing and distribution operations, patient safety, or our ability to meet patient needs. In addition, we do not store or retain individual financial account information or payment card information.
>
> As we actively investigate, we will notify individuals affected by this incident in accordance with applicable law and take steps as needed to protect and remediate the impact to them.
>
> At iRhythm, the patient is at the heart of everything we do. The trust placed in us by patients, clinicians and customers is fundamental to our mission, and protecting the privacy and security of the information entrusted to us is an important part of that commitment. We remain focused on safeguarding our systems and data as we continue to respond to this incident.[7]

29. Similar to its SEC Disclosure, iRhythm's statement refrained from providing iRhythm's patients with pertinent information about the Breach, including, but not limited to, information concerning what kinds of Private Information were stolen, and how much Private Information was stolen.

30. And again, iRhythm seemingly made a point to include statements downplaying the effects of the Breach, despite knowing that the information involved in the Breach can be (and often is) used to carry out fraudulent schemes that cause the same kinds of financial harms that iRhythm (with its statement about the lack of financial account or payment card information) implied would not be at issue.

31. Although iRhythm learned about the Breach weeks ago, it has yet to send notice of the breach to its patients. And in the places where iRhythm has acknowledged the Breach, it has failed to disclose the full picture, leaving out the details necessary for patients and the public to understand the full extent of the Breach, the number of patients involved, the full range of data

[7] *iRhythm Holdings Statement on Cybersecurity Incident*, https://www.irhythmtech.com/us/en/who-we-are/news-events/cybersecurity-statement (last visited June 23, 2026).

that was compromised, and what measures, if any, iRhythm has taken to secure the Private Information still in its possession.

32. iRhythm's failure to provide proper and timely notice of the Breach to those affected by it has required Plaintiff to spend time and money taking additional steps (beyond those that have been necessitated by the Breach itself) to protect himself from the harmful effects of the Breach.

33. Notably, the Breach came days after iRhythm announced that it had agreed to settle class action litigation involving claims that iRhythm had violated federal securities laws for $45 million.[8]

34. The timing of iRhythm's SEC disclosure, coupled with the company's failure to provide pertinent information about the Breach, or to even notify those affected by it, suggests that iRhythm's disclosure to the SEC was motivated primarily by the company being particularly sensitive to securities litigation at the time, rather than by any desire to ensure that those affected by the Breach could take steps to mitigate the harm caused by the exposure of their Private Information.

**C. Defendant's Failure to Prevent, Identify, and Remedy the Breach**

35. Defendant failed to take adequate measures to protect its computer systems against unauthorized systems.

36. The Private Information that Defendant allowed to be exposed in the Data Breach is the type of Private Information that Defendant knew or should have known would be the target of cyberattacks.

37. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate

---

[8] *iRhythm Technologies Reaches $45 Million Securities Class Settlement*, THE GLOBE AND MAIL (JUN. 6, 2026), https://www.theglobeandmail.com/investing/markets/stocks/IRTC/pressreleases/2339096/irhythm-technologies-reaches-45-million-securities-class-settlement/ (last visited June 23, 2026).

response plan if a breach occurs. Immediate notification of a breach is critical so that those impacted can take measures to protect themselves.

38. Despite having knowledge of the risks of cyberattacks, and knowledge of the FTC's data security principles and practices, Defendant failed to disclose that its systems and security practices were inadequate to reasonably safeguard its patients' Private Information.

39. HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[9]

40. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

41. The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[10]

42. Based on information and belief, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. iRhythm's security failures include, but are not limited to, the following:

a. Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

---

[9] HIPAA JOURNAL, *What is Considered Protected Health Information Under HIPAA?, available at:* https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last visited June 23, 2026).

[10] *Breach Notification Rule*, U.S. DEP'T OF HEALTH & HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited June 23, 2026).

b. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

c. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

d. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f. Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g. Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(4);

h. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

i. Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

43. iRhythm was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

44. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[11]

45. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[12] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

46. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for

---

[11] FEDERAL TRADE COMMISSION, *Start With Security: A Guide for Business*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 23, 2026).

[12] FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business*, available at: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 23, 2026).

suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[13]

47. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

48. iRhythm failed to properly implement basic data security practices. iRhythm's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

49. iRhythm was at all times fully aware of its obligation to protect the Private Information of patients because of its position as a trusted healthcare provider. iRhythm was also aware of the significant repercussions that would result from its failure to do so.

50. HHS's Office for Civil Rights notes:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[14]

51. HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Private Information; (b) educating and training healthcare employees on how to protect Private Information; and (c) correcting the configuration of software and network devices.

---

[13] FTC, *Start With Security*, *supra* note 11.

[14] HIPAA JOURNAL, *Cybersecurity Best Practices for Healthcare Organizations*, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last visited June 23, 2026).

52. Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because of value of the Private Information which healthcare entities maintain and because the healthcare industry has been slow to adapt and respond to cybersecurity threats. They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Private Information.

53. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, iRhythm chose to ignore them. These best practices were known, or should have been known by iRhythm, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Private Information.

***D. Plaintiff and Class Members Suffered Damages.***

54. The ramifications of iRhythm's failure to keep patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.

55. The state of California generally prohibits healthcare providers from disclosing a patient's confidential medical information without prior authorization. California's Confidentiality of Medical Information Act ("CMIA") (Cal. Civ. Code § 56.10(a)) states that "a provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or enrollee or subscriber of a health care service plan without first obtaining an authorization except as provided in subdivision (b) or (c)." (*See also* Cal. Civ. Code §§ 1798.80, *et seq*.)

56. In addition to its obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

57. Defendant further owed and breached its duty to Plaintiff and Class Members to implement processes and specifications that would detect a breach of its security systems in a

timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

58. As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class Members' Private Information as detailed above, and Plaintiff and Class Members are now at a heightened and increased risk of identity theft and fraud.

59. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing, or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

60. Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

61. Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in their agreements with iRhythm and they were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

62. As a result of the Data Breach, Plaintiff's and Class Members' Private Information has diminished in value.

63. The Private Information belonging to Plaintiff and Class Members is private, private in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff's or Class Members' consent to disclose such Private Information to any other person as required by applicable law and industry standards.

64. The Data Breach was a direct and proximate result of Defendant's failure to (a) properly safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

65. Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect patient data.

66. Victims of data breaches are susceptible to becoming victims of identity theft, which the FTC defines as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9).

67. Stolen Private Information is often resold on the dark web, a heavily encrypted part of the internet not accessible via traditional search engines, which is regularly used by criminals because of the difficulty law enforcement has with policing it.

68. When cybercriminals, like those that perpetrated the Breach here, infiltrate companies and exfiltrate individuals' Private Information, that information often ends up on the dark web, where other cybercriminals buy and sell that information for profit.[15]

69. Defendant was on notice that companies in the healthcare industry were targets for cyberattacks.

70. Defendant was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related

---

[15] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited June 23, 2026).

systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[16]

71. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[17]

72. The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[18] In 2017, a new record high of 1,579 breaches were reported representing a 44.7 percent increase.[19] That trend continues.

73. When compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[20] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty

---

[16] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited Sept. 7, 2020).

[17] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited June 23, 2026).

[18] IDENTITY THEFT RESOURCE CENTER, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at:* https://www.idtheftcenter.org/surveys-studys (last visited June 23, 2026).

[19] IDENTITY THEFT RESOURCE CENTER, *2017 Annual Data Breach Year-End Review, available at:* https://www.idtheftcenter.org/2017-data-breaches/ (last visited June 23, 2026).

[20] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited June 23, 2026).

percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[21]

31. Healthcare related data breaches have continued to rapidly increase, with several prominent examples in recent years, including Change Healthcare (192.7 million individuals, February 2024), and Episource (5.4 million people, January 2025), as well as several downstream victims of the MOVEit file-transfer breach, including Maximum, Welltok, and Delta Dental of California, each of which involved several million patients' information.

32. According to the FBI's annual internet crime report, healthcare and public health were the single most-targeted sector for cyberthreats in 2025.[22]

74. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[23]

75. In the healthcare industry, the number one threat vector from a cyber security standpoint is phishing. Cybersecurity firm Proofpoint reports that "phishing is the initial point of compromise in most significant [healthcare] security incidents, according to a recent report from the Healthcare Information and Management Systems Society (HIMSS). And yet, 18% of healthcare organizations fail to conduct phishing tests, a finding HIMSS describes as 'incredible.'"[24]

---

[21] *Id.*

[22] AMERICAN HOSPITAL ASSOCIATION, *FBI: Health care was top target for ransomware, other cyberthreats in 2025*, (April 10, 2026), available at https://www.aha.org/news/headline/2026-04-10-fbi-health-care-was-top-target-ransomware-other-cyberthreats-2025 (last visited June 23, 2026)

[23] INSIDE DIGITAL HEALTH, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited June 23, 2026).

[24] Aaron Jensen, *Healthcare Phishing Statistics: 2019 HIMSS Survey Results*, PROOFPOINT (Mar. 27, 2019), https://www.proofpoint.com/us/security-awareness/post/healthcare-phishing-statistics-2019-himss-survey-results (last visited June 23, 2026).

76. The report from Proofpoint was published March 27, 2019, and summarized findings of recent healthcare industry cyber threat surveys and recounted good, common sense steps that the targeted healthcare companies should follow to prevent email-related cyberattacks.

77. One of the best protections against email related threats is security awareness training and testing on a regular basis. This should be a key part of a company's on-going training of its employees. "[S]ince phishing is still a significant, initial point of compromise, additional work needs to be done to further lower the click rate," the HIMSS report states. "This can be done through more frequent security awareness training, phishing simulation, and better monitoring of metrics pertaining to phishing (including whether there are any particular repeat offenders)."[25]

78. ProtonMail Technologies publishes a guide for IT Security to small businesses (i.e., companies without the heightened standard of care applicable in the healthcare industry). In its 2019 guide, ProtonMail dedicates a full chapter of its Book guide to the danger of phishing and ways to prevent a small business from falling prey to it. It reports:

> Phishing and fraud are becoming ever more extensive problems. A recent threat survey from the cybersecurity firm Proofpoint stated that between 2017 and 2018, email-based attacks on businesses increased 476 percent. The FBI reported that these types of attacks cost companies around the world $12 billion annually.
>
> Similar to your overall IT security, your email security relies on training your employees to implement security best practices and to recognize possible phishing attempts. This must be deeply ingrained into every staff member so that every time they check their emails, they are alert to the possibility of malicious action.[26]

79. The guidance that ProtonMail provides non-healthcare industry small businesses is likely still not adequate for a company like iRhythm, with the heightened healthcare standard of care based on HIPAA, CMIA, and the increased danger from the sensitivity and wealth of Private Information it retains, but ProtonMail's guidance is informative for showing how

---

[25] *Id.*

[26] *The ProtonMail Guide to IT Security for Small Businesses*, PROTONMAIL (2019), *available at* https://protonmail.com/it-security-complete-guide-for-businesses (last visited Sept. 7, 2020).

inadequately iRhythm protected the Private Information of the Plaintiff and Class Members. ProofPoint lists numerous tools under the heading, "How to Prevent Phishing":

a. **Training:** "Training your employees on how to recognize phishing emails and what to do when they encounter one is the first and most important step in maintaining email security. *This training should be continuous as well.* . . ."

b. **Limit Public Information:** "Attackers cannot target your employees if they don't know their email addresses. Don't publish non-essential contact details on your website or any public directories . . . .

c. **Carefully check emails:** "First off, your employees should be skeptical anytime they receive an email from an unknown sender. Second, most phishing emails are riddled with typos, odd syntax, or stilted language. Finally, check the 'From' address to see if it is odd . . . . If an email looks suspicious, employees should report it."

d. **Beware of links and attachments:** "Do not click on links or download attachments without verifying the source first and establishing the legitimacy of the link or attachment. . . ."

e. **Do not automatically download remote content:** "Remote content in emails, like photos, can run scripts on your computer that you are not expecting, and advanced hackers can hide malicious code in them. You should configure your email service provider to not automatically download remote content. This will allow you to verify an email is legitimate before you run any unknown scripts contained in it."

f. **Hover over hyperlinks:** "Never click on hyperlinked text without hovering your cursor over the link first to check the destination URL, which should appear in the lower corner of your window. Sometimes the hacker might disguise a malicious link as a short URL." [Proofpoint notes that there are tools online available for retrieving original URLs from shortened ones.]

g. **If in doubt, investigate:** "Often phishing emails will try to create a false sense of urgency by saying something requires your immediate action. However, if your employees are not sure if an email is genuine, they should not be afraid to take extra time to verify the email. This might include asking a colleague, your IT security lead, looking up the website of the service the email is purportedly from, or, if they have a phone number, calling the institution, colleague, or client that sent the email."

h. **Take preventative measures:** "Using an end-to-end encrypted email service gives your business's emails an added layer of protection in the case of a data breach. A spam filter will remove the numerous random emails that you might receive, making it more difficult for a phishing attack to get through. Finally, other tools, like Domain-based Message Authentication, Reporting, and Conformance

> (DMARC) help you be sure that the email came from the person it claims to come from, making it easier to identify potential phishing attacks."[27]

80. These are basic, common-sense email security measures that every business, not only healthcare businesses, should be doing. iRhythm, with its heightened standard of care should be doing even more. But by adequately taking these common-sense solutions, iRhythm could have prevented this Data Breach from occurring.

81. Had Defendant remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff's and Class Members' Private Information.

82. As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

83. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[28]

84. At all relevant times, Defendant was well aware that the Private Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

85. As a healthcare provider, iRhythm knew, or should have known, the importance of safeguarding the patients' Private Information entrusted to it and of the foreseeable consequences

---

[27] *Id.*

[28] U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS BUREAU OF JUSTICE STATISTICS, *Victims of Identity Theft, 2012* (Dec. 2013) *available at*: https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited June 23, 2026).

if its data security systems were breached. This includes the significant costs that would be imposed on iRhythm's patients as a result of a breach. iRhythm failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

86. iRhythm acquires, collects, and stores a massive amount of its patients' protected health information and other personally identifiable data.

87. As a condition of engaging in health services, iRhythm requires that these patients entrust them with highly confidential Private Information.

88. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, iRhythm assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

89. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information, and, as current and former patients, they relied on iRhythm to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

90. Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[29] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and PHI on multiple underground Internet websites, commonly referred to as the dark web.

91. While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363 according to the Infosec Institute.[30]

[29] FEDERAL TRADE COMMISSION, *Warning Signs of Identity Theft, available at:* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited June 23, 2026).

[30] CENTER FOR INTERNET SECURITY, *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited June 23, 2026).

92. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

93. Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[31]

94. Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

95. The ramifications of iRhythm's failure to keep its patients' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

96. Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

[31] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER HEALTH NEWS (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/ (last visited June 23, 2026).

97. Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[32] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[33]

98. Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[34] Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[35] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[36]

99. As a healthcare provider, iRhythm knew, or should have known, the importance of safeguarding its patients' Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be

---

[32] *See Medical ID Theft Checklist*, IDENTITYFORCE (Jan. 11, 2023), https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited June 23, 2026).

[33] EXPERIAN, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages*"), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited June 23, 2026).

[34] IDENTITY THEFT RESOURCE CENTER, *2018 End-of-Year Data Breach Report, available at*: https://notified.idtheftcenter.org/s/resource (last visited June 23, 2026).

[35] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited June 23, 2026); *see also National Survey on Medical Identity Theft*, Feb. 22, 2010, cited at p. 2.

[36] *Id.*

imposed on iRhythm's patients as a result of a breach. iRhythm failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**E. Plaintiff's Experience**

100. Jacob Dalessandro is a patient of Defendant who began using Defendant's products several years ago. As a condition of using Defendant's product, Mr. Dalessandro provided Defendant, either directly or indirectly, with his Private Information.

101. Additionally, as part of providing services to Mr. Dalessandro, including the heartrate monitoring and data analysis, Defendant collected Private Information from Mr. Dalessandro.

102. Defendant was in possession of Mr. Dalessandro's Private Information before, during, and after the Data Breach.

103. Mr. Dalessandro reasonably understood and expected that Defendant would safeguard his Private Information and timely and adequately notify him in the event of a Data Breach. Mr. Dalessandro would not have allowed Defendant, or anyone in Defendant's possession, to maintain his Private Information if he believed that Defendant would fail to implement reasonable and industry-standard practices to safeguard that information from unauthorized access.

104. Mr. Dalessandro greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Mr. Dalessandro is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

105. Mr. Dalessandro stores documents containing Private Information in a secure location and when he chooses not to retain documents in the mail that contain Private Information, Mr. Dalessandro destroys those documents.

106. As a result of the Data Breach, Mr. Dalessandro has spent time researching the Data Breach, reviewing bank accounts, and engaging in other necessary mitigation efforts. This is valuable time that Mr. Dalessandro would have spent on other activities, including but not limited to work and/or recreation.

107. As a consequence of and following the Data Breach, Mr. Dalessandro has experienced a significant uptick in spam calls, messages, and emails.

108. Mr. Dalessandro anticipates spending considerable time and money on an ongoing basis to try and mitigate and address the harms caused by the Data Breach. In addition, Mr. Dalessandro will continue to be at present and continued risk of identity theft and fraud for years to come.

109. Mr. Dalessandro has a continuing interest in ensuring that his Private Information, which remains in Defendant's possession, is protected and safeguarded from future breaches.

## F. CLASS ALLEGATIONS

110. Plaintiff brings this class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

111. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> **All individuals whose Private Information was compromised in the data breach iRhythm disclosed in its June 15, 2026, filing with the Securities and Exchange Commission.**

112. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

113. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

114. Numerosity, Fed R. Civ. P. 23(a)(1): The Class is so numerous that joinder of all members is impracticable. Defendant maintains records of millions of patients, and on information and belief, the Private Information of these patients was improperly accessed in the Data Breach.

115. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. When Defendant actually learned of the Data Breach and whether its response was adequate;

b. Whether Defendant owed a duty to the Classes to exercise due care in collecting, storing, safeguarding, and/or obtaining their Private Information;

c. Whether Defendant breached that duty;

d. Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiff's and Class Members' Private Information;

e. Whether Defendant acted negligently in connection with the monitoring and/or protecting of Plaintiff's and Class Members' PII/PHI;

f. Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class Members' PII/PHI secure and prevent loss or misuse of that Private Information;

g. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether Defendant caused Plaintiff's and Class Members' damages;

i. Whether Defendant violated the law by failing to promptly notify Class Members that their Private Information had been compromised;

j. Whether Plaintiff and the other Class Members are entitled to actual damages, credit monitoring, and other monetary relief;

k. Whether Defendant violated the California Unfair Competition Law (Business & Professions Code § 17200, *et seq*.); and

l. Whether Defendant violated the Confidentiality of Medical Information Act (Cal. Civ. Code § 56, *et seq*.).

116. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

117. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

118. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intend to prosecute this action vigorously.

119. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

120. The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

121. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

122. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

123. Unless a Class-wide injunction is issued, Plaintiff and Class Members remain at risk that Defendant will continue to fail to properly secure the Private Information of Plaintiff and Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Complaint.

124. Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

125. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e. Whether Class Members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

126. Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

127. As a condition of receiving services, Plaintiff and Class Members were obligated to directly provide to iRhythm or indirectly provide to iRhythm through their other healthcare providers with their Private Information.

128. Plaintiff and Class Members entrusted their Private Information to iRhythm with the understanding that iRhythm would safeguard their information.

129. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

130. Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to

unauthorized parties. This duty includes, among other things, designing, maintaining, and testing its security protocols to ensure that Private Information in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on relevant cybersecurity measures.

131. Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and Class Members, the critical importance of providing adequate security of that Private Information, the current cyber scams being perpetrated, and that it had inadequate employee training and education and IT security protocols in place to secure the Private Information of Plaintiff and Class Members.

132. Defendant's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decision not to comply with HIPAA and industry standards for the safekeeping and encrypted authorized disclosure of the Private Information of Plaintiff and Class Members.

133. Plaintiff and Class Members had no ability to protect their Private Information that was in Defendant's possession.

134. Defendant was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

135. Defendant had a duty to put proper procedures in place to prevent the unauthorized dissemination of Plaintiff's and Class Members' Private Information.

136. Defendant has admitted that Plaintiff's and Class Members' Private Information was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

137. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information while it was within Defendant's possession or control.

138. Defendant improperly and inadequately safeguarded Plaintiff's and Class Members' Private Information in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

139. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its Plaintiff's and Class Members' Private Information.

140. Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

141. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class Members, Plaintiff's and Class Members' Private Information would not have been compromised and/or subsequently misused by unauthorized third parties to engage in fraudulent activity further harming Plaintiff and Class Members.

142. There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the Private Information and the harm suffered, or risk of imminent harm suffered, by Plaintiff and the Class.

143. As a result of Defendant's negligence, unauthorized parties acquired Plaintiff's Private Information and used that specific information to harm Plaintiff and Class Members as described above. As a further result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer damages and injury including, but not limited to, (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) diminished value of the Private Information; (f) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (g) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate

and adequate measures to protect Private Information in their continued possession; and (h) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

144. Violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se*.

145. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as iRhythm, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

146. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

147. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

148. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

149. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

150. Defendant's violation of HIPAA also independently constitutes negligence *per se*.

151. HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such

information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

152. Plaintiff and Class Members are within the class of persons that HIPAA privacy laws were intended to protect.

153. The harm that occurred as a result of the Data Breach is the type of harm HIPAA privacy laws were intended to guard against.

154. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

155. Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

## COUNT II
## INVASION OF PRIVACY
## (On Behalf of Plaintiff and the Class)

156. Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

157. California established the right to privacy in Article 1, Section 1 of the California Constitution.

158. The State of California recognizes the tort of Intrusion into Private Affairs, and

adopts the formulation of that tort found in the Restatement (Second) of Torts which states:

159. One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy if the intrusion would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652B (1977).

160. Plaintiff and Class Members had a legitimate and reasonable expectation of privacy with respect to their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

161. Defendant owed a duty to patients in their network, including Plaintiff and Class Members, to keep their Private Information confidential.

162. The unauthorized release of Private Information, especially the type related to personal health information, is highly offensive to a reasonable person.

163. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members disclosed their Private Information to Defendant as part of their use of Defendant's services, but privately, with the intention that the Private Information would be kept confidential and protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

164. The Data Breach constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

165. Defendant acted with a knowing state of mind when it permitted the Data Breach because they knew its information security practices were inadequate and would likely result in a data breach such as the one that harmed Plaintiff and Class Members.

166. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and Class Members.

167. As a proximate result of Defendant's acts and omissions, Plaintiff's and Class Members' Private Information was disclosed to and used by third parties without authorization in

the manner described above, causing Plaintiff and Class Members to suffer damages.

168. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the Private Information maintained by Defendant can be viewed, distributed, and used by unauthorized persons.

169. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

**COUNT III**
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Class)**

170. Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

171. Plaintiff and other Class Members entered into valid and enforceable express contracts with Defendant under which Plaintiff and other Class Members agreed to provide their Private Information to Defendant, and Defendant agreed to provide services and, impliedly if not explicitly, agreed to protect Plaintiff's and other Class Members' Private Information.

172. These contracts include, but are not limited to, test requisition forms, patient signature cards, HIPAA authorization forms, and patient consent forms.

173. To the extent Defendant's obligation to protect Plaintiff's and other Class Members' Private Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendant to implement data security adequate to safeguard and protect the confidentiality of Plaintiff's and other Class Members' Private Information, including in accordance with HIPAA regulations; federal, state and local laws; and industry standards. No Plaintiff would have entered into these contracts with Defendant without understanding that Plaintiff's and other Class Members' Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

174. A meeting of the minds occurred, as Plaintiff and other Class Members agreed, among other things, to provide their Private Information to allow Defendant to conduct heart

monitoring for monetary benefit, in exchange for Defendant's agreement to protect the confidentiality of that Private Information.

175. Both the provision of heart monitoring and the protection of Plaintiff's and other Class Members' Private Information were material aspects of Plaintiff's and other Class Members' contracts with Defendant.

176. Defendant's promises and representations described above relating to HIPAA, CMIA, and industry practices, and about Defendant's purported concern about its patients' privacy rights became terms of the contracts between Defendant and its patients, including Plaintiff and other Class Members. Defendant breached these promises by failing to comply with HIPAA, CMIA, and reasonable industry practices.

177. Plaintiff and Class Members read, reviewed, and/or relied on statements made by or provided by iRhythm and/or otherwise understood that iRhythm would protect its patients' Private Information if that information were provided to iRhythm.

178. Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant; however, Defendant did not.

179. As a result of Defendant's breach of these terms, Plaintiff and other Class Members have suffered a variety of damages including but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendant; they lost the difference in the value of the secure health services Defendant promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiff and other Class Members have been put at risk of future harm, which may take months if not years to manifest, discover, and detect.

180. Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

181. Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

182. Plaintiff and Class Members were required to provide their Private Information, to Defendant as a condition of their use of Defendant's services. By providing their Private Information, and upon Defendant's acceptance of such information, Plaintiff and all Class Members, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contracts concerning services to be provided by Defendant to Plaintiff.

183. These implied-in-fact contracts obligated Defendant to take reasonable steps to secure and safeguard Plaintiff's and other Class Members' Private Information. The terms of these implied contracts are further described in the federal laws, state laws, and industry standards alleged above, and Defendant expressly assented to these terms in their public statements.

184. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services, along with Defendant's promise to protect their health information and other Private Information from unauthorized disclosure.

185. In their written privacy policies, iRhythm expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

186. iRhythm promised to comply with HIPAA standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

187. Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide Private Information was Defendant's obligation to (a) use such Private Information for business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized disclosures of the Private Information; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information of Plaintiff and Class

Members from unauthorized disclosure or uses; and (f) retain the Private Information only under conditions that kept such information secure and confidential.

188. Without such implied contracts, Plaintiff and Class Members would not have provided their Private Information to Defendant.

189. Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant; however, Defendant did not.

190. Defendant breached the implied contracts with Plaintiff and Class Members by failing to conduct the following:

a. reasonably safeguard and protect Plaintiff's and Class Members' Private Information, which was compromised as a result of the Data Breach;

b. comply with its promise to abide by HIPAA;

c. ensure the confidentiality and integrity of electronic protected health information that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R 164.306(a)(1);

d. implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R 164.312(a)(1);

e. implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R 164.308(a)(1);

f. identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R 164.308(a)(6)(ii); and

g. protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R 164.306(a)(2).

191. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and other Class Members have suffered a variety of damages including but not limited

to: the lost value of their privacy; they did not get the benefit of their bargain with Defendant; they lost the difference in the value of the secure health services Defendant promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiff and other Class Members have been put at risk of future harm, which may take months if not years to manifest, discover, and detect.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

192. Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

193. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

194. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

195. The amounts Plaintiff and Class Members paid for goods and services were used, in part, to pay for use of Defendant's network and the administrative costs of data management and security.

196. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry

standards.

197. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

198. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

199. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to Defendant's services.

200. Plaintiff and Class Members have no adequate remedy at law.

201. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

202. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

203. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that its unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class

Members overpaid for Defendant's services.

**COUNT VI**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. – UNLAWFUL, FRAUDULENT, AND UNFAIR BUSINESS PRACTICES**
**(On Behalf of Plaintiff and the Class)**

204. Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

205. The California Unfair Competition Law, Cal. Bus. & Prof. Code sections 17200 e*t seq*. ("UCL"), prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

206. By reason of Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiff and Class members' Private Information, Defendant engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

207. Defendant has violated Cal. Bus. and Prof. Code § 17200, *et seq*., by engaging in unlawful, unfair, or fraudulent business acts and practices and unfair, deceptive, untrue, or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Nationwide Class.

208. Defendant's business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, in that the Private Information of Plaintiff and Class Members has been compromised for unauthorized parties to see, use, and otherwise exploit.

209. Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff's and Class Members' Private Information also constitute "unfair" business acts and practices within the meaning of Business & Professions Code sections 17200 *et seq*., in that Defendant's conduct was substantially injurious to Plaintiff and Class Members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendant's conduct outweighs any

alleged benefits attributable to such conduct.

210. Defendant engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiff's and Class Members' Private Information with knowledge that the information would not be adequately protected; and by storing Plaintiff's and Class Members' Private Information in an unsecure electronic environment in violation of HIPAA and California's data breach statute, Cal. Civ. Code § 1798.81.5, which require Defendant to take reasonable methods of safeguarding the Private Information of Plaintiff and the Class Members.

211. Defendant's practices were also unlawful and in violation of Civil Code sections 1798 *et seq.* and Defendant's own privacy policy because Defendant failed to take reasonable measures to protect Plaintiff's and Class Members' Private Information and failed to take remedial measures such as notifying its users when it first discovered that their Private Information may have been compromised.

212. In addition, Defendant engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82 and Cal. Health & Safety Code §1280.15(b)(2).

213. Defendant's business practices as alleged herein are fraudulent because they are likely to deceive consumers into believing that the Private Information they provided to Defendant will remain private and secure, when in fact it has not been maintained in a private and secure manner, and that Defendant would take proper measures to investigate and remediate a data breach, when Defendant did not do so.

214. Plaintiff and Class Members suffered (and continue to suffer) injury in fact and lost money or property as a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions including, *inter alia*, the unauthorized release and disclosure of their Private Information and lack of notice.

215. But for Defendant's misrepresentations and omissions, Plaintiff and Class Members would not have provided their Private Information to Defendant or would have insisted that their Private Information be more securely protected.

216. As a direct and proximate result of Defendant's unlawful practices and acts, Plaintiff and Class Members were injured and lost money or property, including but not limited to the price received by Defendant for the services, the loss of Plaintiff's and Class Members' legally protected interest in the confidentiality and privacy of their Private Information, nominal damages, and additional losses as described herein.

217. Defendant knew or should have known that Defendant's computer systems and data security practices were inadequate to safeguard Plaintiff's and Class Members' Private Information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unlawful practices and acts were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Class Members.

218. Plaintiff, on behalf of the Class, seeks relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, restitution to Plaintiff and Class Members of money or property that Defendant may have acquired by means of Defendant's unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendant because of Defendant's unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

## COUNT VII
## VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE § 56, *ET SEQ*.
## (On Behalf of Plaintiff and the Class)

219. Plaintiff restates and reallege all of the foregoing Paragraphs as if fully set forth herein.

220. At all relevant times, Defendant was a health care provider because it had the "purpose of maintaining medical information to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage his or her information, or for the diagnosis or treatment of the individual."

221. Defendant is a provider of healthcare within the meaning of Civil Code § 56.06(a) and maintains medical information as defined by Civil Code § 56.05.

222. Plaintiff and Class Members are patients of Defendant, as defined in Civil Code § 56.05(k).

223. Plaintiff and Class Members provided their personal medical information to Defendant.

224. At all relevant times, Defendant collected, stored, managed, and transmitted Plaintiff's and Class Members' personal medical information.

225. Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

226. As a result of the Data Breach, Defendant has misused, disclosed, and/or allowed third parties to access and view Plaintiff's and Class Members' personal medical information without their written authorization compliant with the provisions of Civil Code §§ 56, *et seq*.

227. As a further result of the Data Breach, the confidential nature of the plaintiff's medical information was breached as a result of Defendant's negligence. Specifically, Defendant knowingly allowed and affirmatively acted in a manner that actually allowed unauthorized parties to access and view Plaintiff's and Class Members' Private Information, which was viewed and used when the unauthorized parties engaged in the above-described fraudulent activity.

228. Defendant's misuse and/or disclosure of medical information regarding Plaintiff and Class Members constitutes a violation of Civil Code §§ 56.10, 56.11, 56.13, and 56.26.

229. As a direct and proximate result of Defendant's wrongful actions, inaction, omissions, and want of ordinary care, Plaintiff's and Class Members' personal medical information was disclosed without written authorization.

230. By disclosing Plaintiff's and Class Members' Private Information without their written authorization, Defendant violated California Civil Code § 56, *et seq*., and its legal duty to protect the confidentiality of such information.

231. Defendant also violated Sections 56.06 and 56.101 of the California CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction, or

disposal of confidential personal medical information.

232. As a direct and proximate result of Defendant's wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff's and Class Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiff's and Class Members' written authorization.

233. As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violation of the CMIA, Plaintiff and Class Members are entitled to (i) actual damages, (ii) nominal damages of $1,000 per Plaintiff and Class Member, (iii) punitive damages of up to $3,000 per Plaintiff and Class Member, and (iv) attorneys' fees, litigation expenses and court costs under California Civil Code § 56.35.

**COUNT VIII**
**VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**CAL. CIV. CODE § 1750, *ET SEQ*.**
**(On Behalf of Plaintiff and the Class)**

234. Plaintiff restates and realleges all the foregoing Paragraphs as if fully set forth herein.

235. This cause of action is brought pursuant to the California Consumer Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq*.

236. Defendant has had notice of Plaintiff's allegations, claims and demands, including from the filing of other actions against it arising from the Data Breach, the first of which was filed on or about June 18, 2026. Further, Defendant is the party with the most knowledge of the underlying facts giving rise to Plaintiff's allegations, so that any pre-suit notice would not put Defendant in a better position to evaluate those claims. To the extent additional notice is required, Plaintiff will issue separate demands under Cal. Civ. Code § 1782(a).

237. Plaintiff and Class Members are "consumers," as the term is defined by California Civil Code § 1761(d).

238. Plaintiff, Class Members, and Defendant have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

239. The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant was likely to deceive consumers.

240. Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

241. Defendant violated this provision by representing that it took appropriate measures to protect Plaintiff's and the Class Members' Private Information. Additionally, Defendant improperly handled, stored, or protected either unencrypted or partially encrypted data.

242. Plaintiff and the Class members relied upon iRhythm's representations and were induced to sign up for iRhythm's services, and provide their Private Information which contains value in order to obtain services from iRhythm.

243. As a result, Plaintiff and Class Members were induced to enter into a relationship with Defendant and provide their Private Information.

244. As a result of engaging in such conduct, Defendant has violated Civil Code § 1770.

245. Pursuant to Civil Code § 1780(a)(2) and (a)(5), Plaintiff seeks an order of this Court that includes, but is not limited to, an order enjoining Defendant from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

246. Plaintiff and Class Members suffered injuries caused by Defendant's misrepresentations, because they provided their Private Information believing that Defendant would adequately protect this information.

247. Plaintiff and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

248. The unfair and deceptive acts and practices of Defendant, as described above, present a serious threat to Plaintiff and Class Members.

**COUNT IX**
**VIOLATION OF CALIFORNIA CONSUMER RECORDS ACT**
**CAL. CIV. CODE § 1798.80 *ET SEQ*.**
**(On Behalf of Plaintiff and the Class)**

249. Plaintiff restates and realleges all of the foregoing Paragraphs as if fully set forth herein.

250. Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under section 1798.82, the disclosure "shall be made in the most expedient time possible and without unreasonable delay . . . ."

251. The CCRA further provides: "Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b).

252. Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

a. The security breach notification shall be written in plain language;

b. The security breach notification shall include, at a minimum, the following information:

i. The name and contact information of the reporting person or business subject to this section;

ii. A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

iii. If the information is possible to determine at the time the notice is provided, then any of the following:

1. The date of the breach;
2. The estimated date of the breach; or
3. The date range within which the breach occurred. The notification shall also include the date of the notice.

iv. Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

v. A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

vi. The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

253. The Data Breach described herein constituted a "breach of the security system" of Defendant.

254. As alleged above, Defendant unreasonably delayed informing Plaintiff and Class Members about the Data Breach, affecting their Personal and Medical Information, after Defendant knew the Data Breach had occurred.

255. Defendant failed to disclose to Plaintiff and Class Members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Personal and Medical Information when Defendant knew or reasonably believed such information had been compromised.

256. Defendant's ongoing business interests gave Defendant incentive to conceal the Data Breach from the public to ensure continued revenue.

257. Upon information and belief, no law enforcement agency instructed Defendant that timely notification to Plaintiff and Class Members would impede its investigation.

258. As a result of Defendant's violation of Cal. Civ. Code § 1798.82, Plaintiff and Class Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a

credit freeze. These measures could have prevented some of the damages suffered by Plaintiff and Class Members because their stolen information would have had less value to identity thieves.

259. As a result of Defendant's violation of Cal. Civ. Code § 1798.82, Plaintiff and Class Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

260. Plaintiff and Class Members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to the damages suffered by Plaintiff and Class Members as alleged above and equitable relief.

261. Defendant's misconduct as alleged herein is fraud under Cal. Civ. Code § 3294(c)(3) in that it was deceit or concealment of a material fact known to the Defendant conducted with the intent on the part of Defendant of depriving Plaintiff and Class Members of "legal rights or otherwise causing injury." In addition, Defendant's misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) in that it was despicable conduct carried on by Defendant with a willful and conscious disregard of the rights or safety of Plaintiff and Class Members and despicable conduct that has subjected Plaintiff and Class Members to hardship in conscious disregard of their rights. As a result, Plaintiff and Class Members are entitled to punitive damages against Defendant under Cal. Civ. Code § 3294(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all members of the Class, requests judgment against the Defendant and that the Court grant the following relief:

A. An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

B. Injunctive relief requiring Defendant to (1) strengthen its data security systems that maintain personally identifying information to comply with the applicable state laws alleged herein (including, but not limited to, the California Customer Records Act) and best practices under industry standards; (2) engage third-party auditors

and internal personnel to conduct security testing and audits on Defendant's systems on a periodic basis; (3) promptly correct any problems or issues detected by such audits and testing; and (4) routinely and continually conduct training to inform internal security personnel how to prevent, identify and contain a breach, and how to appropriately respond;

C. An order requiring Defendant to pay all costs associated with class notice and administration of class-wide relief;

D. An award to Plaintiff and all members of the Class of compensatory, consequential, incidental, and statutory damages, restitution, and disgorgement, in an amount to be determined at trial;

E. An award of nominal damages of $1,000 per Plaintiff and Class Member to Plaintiff and all members of the Classes under California Civil Code § 56.35;

F. An award of punitive damages of up to $3,000 per Plaintiff and Class Member under California Civil Code § 56.35;

G. An award of credit monitoring and identity theft protection services to Plaintiff and all members of the Classes;

H. An award of attorneys' fees, costs, and expenses, as provided by law or equity;

I. An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

J. An order requiring Defendant to pay pre-judgment and post-judgment interest, as provided by law or equity; and

K. Such other and further relief as this Court may deem just and proper.

Dated: June 23, 2026 By: */s/ Sonum Dixit*

Amber L. Schubert (SBN 278696)
Sonum Dixit (SBN 353395)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123

Tel: 415-788-4220
Fax: 415-788-0161
aschubert@sjk.law
sdixit@sjk.law

Jean S. Martin (Pro Hac Vice Forthcoming)
Christopher Pollack (Pro Hac Vice Forthcoming)
**AYLSTOCK WITKIN KREIS**
**& OVERHOLTZ, PLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
(850) 202-1010
Jmartin@awkolaw.com
Cpollack@awkolaw.com